IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| WILLIAM M,[1]<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER of SOCIAL SECURITY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)   Case No. 24-cv-2287-RJD[2]<br>)<br>)<br>)<br>)<br>) |

## ORDER

**DALY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for DIB in January 2023, alleging an onset date of January 3, 2021. Tr. 17, 245. After holding an evidentiary hearing on May 9, 2024, ALJ Marcus Johns denied the application. Tr. 29, 33. The Appeals Council denied Plaintiff's request for review, making the ALJ's decision final and subject to judicial review. Tr. 1. Plaintiff filed a timely Complaint with this Court.

---

[1] In keeping with the court's practice, Plaintiff's full name will not be used in this Order due to privacy concerns. *See* Advisory Committee Notes to Fed. R. Civ. P. 5.2(c).

[2] Pursuant to 28 U.S.C. §636(c), this case was assigned to the undersigned for final disposition upon consent of the parties. Doc. 10.

**Issues Raised by Plaintiff**

Plaintiff makes the following arguments:

1.  The ALJ's decision was not based on substantial evidence.

2.  The ALJ improperly evaluated Plaintiff's subjective symptoms.

**Applicable Legal Standards**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes and regulations. The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   A person is disabled if she cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."   42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) is the claimant doing substantial gainful activity?; (2) does the claimant have a severe medically determinable physical or mental impairment?; (3) does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations?; (4) is the claimant able to perform his former occupation?; and (5) is the claimant able to perform any other work?   20 C.F.R. § 404.1520(a)(4).   An affirmative answer at step 1 or step 4 or step 5 precludes a finding of disability.   *Id*.

This Court determines whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   *Tutweiler v. Kijakazi*, 87 F. 4th 853, 857 (7th Cir. 2023) (internal citations and quotations omitted).   Substantial evidence is defined as "relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Id.*   In

reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Warnell v. O'Malley*, 97 F.4th 1050, 1052 (7th Cir. 2023) (internal citations and quotations omitted).    However, the undersigned does not act as a rubber stamp for the Commissioner. *See Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015). There must be a "logical bridge" between the ALJ's conclusion and the evidence. *Hess v. O'Malley*, 92 F. 4th 671, 676-77 (7th Cir. 2024) (*citing Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020)).

### The Decision of the ALJ

The ALJ followed the required five-step analytical framework. He determined that Plaintiff had not engaged in substantial gainful activity from his amended alleged onset date of January 3, 2021 through his last date insured of March 31, 2023. Tr. 19. He determined that Plaintiff had the following severe impairments through the last date insured: cervical and lumbar spine degenerative disc disease, cervical spine radiculopathy, and osteoarthritis left wrist, left shoulder, and right knee. Tr. 19. However, he found that through the date last insured, Plaintiff did "not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments" in the applicable regulations. Tr. 21.

The ALJ found that "the lack of evidence regarding the claimant's subjective allegations, his mostly mild examination findings, and his ability to perform activities" supported the following residual functional capacity determination, that Plaintiff could:

> Perform light work…he can frequently handle and perform overhead reaching with the left upper extremity. He can never climb ladders, ropes, and scaffolds. He can frequently climb ramps and stairs. He can occasionally balance, stoop, kneel, crouch, and crawl. He can never drive commercial vehicles. He must avoid

Page **3** of **11**

concentrated exposure to vibration, and to hazards as defined in the Selected Characteristics of Occupations (SCO) and the Dictionary of Occupational Titles (DOT).

Tr. 23, 27.   The ALJ concluded that "[t]hrough the date last insured…..there were jobs that existed in significant numbers in the national economy that the claimant could have performed."   Tr. 27.

### The Evidentiary Record

The following summary of the record is tailored to Plaintiff's arguments.

**1.     Medical records cited by the ALJ (Tr. 25-27)**

Plaintiff received treatment for his neck pain at The Orthopedic Institute of Southern Illinois.   At a visit on March 9, 2021, the physician noted a history of pain in the cervical spine and numbness/tingling in his left arm.   Tr. 397.   Plaintiff had neck surgery in 2016 and "now feels that his bones are grinding in his neck."   Tr. 397.   An x-ray revealed moderate degenerative disc disease and moderate osteoarthritis.   Tr. 400.   The physician performed a cervical exam with positive findings.   Tr. 399.   The physician ordered a series of steroid injections and Plaintiff was instructed to follow-up with pain management, as well as continue to use his traction unit at home. Tr. 400.   The physician also noted "may consider medical branch blocks/RFA in the future."   Tr. 400.

The next day, Plaintiff underwent a steroid injection.   Tr. 408.   He reported that it provided 50% pain relief in his left arm, but did not alleviate any neck pain.   Tr. 408.   Plaintiff's physician recommended bilateral medial branch blocks "to test if radiofrequency ablation (RFA" would benefit and help reduce patient's pain."   Tr. 410.   Plaintiff underwent the medial branch nerve block procedure on June 4, 2021.   Tr. 413.    He returned six days later, requesting treatment for left wrist pain that he said started while he was carrying posts for a fence.   Tr. 415.

Plaintiff underwent another cervical epidural steroid injection in October 2021 that provided him 60% pain relief and increase in function.   Tr. 439.   He also reported "burning pain to the left clavicle" and that he had decreased range of motion of the upper extremities caused by his neck pain.   Tr. 439.   He could not shoot his bow and arrow.   Tr. 439.   On December 1, 2021, he underwent the RFA procedure and it provided him with 80% relief.   Tr. 445, 447.   The next day, Plaintiff presented to his primary care doctor at the VA and reported that he had left shoulder pain and decreased range of motion after "lifting a heavy object."   Tr. 1140.   Ten days later, he sought treatment from the Emergency Room at the VA Hospital when "grinding dust blew into [his] eye" while "doing some welding."   Tr. 1133.

On January 8, 2022, Plaintiff was "knocked over, landed on, and trampled by a horse." Tr. 1054.   He was examined by two doctors at the VA Hospital who ultimately determined that he had a significant contusion on his right arm.   Tr. 1065.

Plaintiff received a cervical transforaminal epidural steroid injection on January 12, 2022 that provided him with 50% pain relief and increased daily functioning for six weeks, but then the pain returned.   Tr. 453.   He received two more cervical steroid injections in March 2022 and June 2022 and reported that his symptoms slightly improved.   Tr. 457, 463, 471.   While receiving follow-up treatment for the "crush injury from January 2022" at the VA in April 2022, a physical therapist noted that Plaintiff reported pain in his left hip after "jumping over a ditch in the woods but otherwise is doing well and is able to do normal activity without hip pain.   His back does continue to cause problems at times, and had a horse step[] on his toes this morning which is also painful."   Tr. 318-19.

Plaintiff also received epidural steroid injections for pain in the sacroiliac joint in June

2022 and lumbar pain in July 2022.   Tr. 478, 480.   These injections provided him with 80% pain

relief and increased function.   Tr. 482.   He received a cervical steroid injection in August 2022

and a bilateral sacroiliac joint injection in September 2022.   Tr. 495, 497.

In October 2022, Plaintiff underwent magnetic resonance imaging of his left shoulder after

reporting acute pain and decreased range of motion.   The imaging reflected a grade-1 strain,

tendinosis at two locations, a "full thickness tear" of the biceps tendon, osteoarthritis, cartilage

loss, and degenerative changes of the AC joint.   Tr. 676.

Two months later, Plaintiff presented to the VA Hospital and reported that he was 'hit in

back with trailer ramp and knocked to the ground."   Tr. 670.   He underwent cervical spine x-

rays.   The report stated that he had "mild disc space narrowing at C3-C4.   Post op changes at C4-

C5 and C5-C6….moderate spondylosis from C4-C6 with mild spondylosis of the upper cervical

spine.   Moderate severe narrowing bilaterally C4-5, C5-6, and C6-7."   Tr. 671.   He underwent

an x-ray of his pelvis after reporting left hip pain related to the trailer ramp accident.   The report

stated "no fracture or dislocation is noted. The visualized osseous structures are intact. Postop

changes in the lower lumbar spine noted."   Tr. 669, 670.

In November 2023, Plaintiff underwent a CT scan of his cervical spine after a hunting

incident.   Tr. 1413.   In a message to his doctor, Plaintiff explained that the deer stand upon which

he was standing "slid approximately 25' feet down the tree."   Tr. 1640.   Following the CT scan,

the radiologist reported that there was no evidence of acute fracture or traumatic malalignment,

but there was "multilevel degenerative change which would be better evaluated by MRI."   Tr.

1414.   The ALJ noted that this evidence occurred after the date last insured (March 31, 2023) and

that "this evidence continues to support finding that he can perform light work with the restrictions

in the above residual functional capacity assessment."   Tr. 27.

### 2.   Agency Records

Plaintiff completed a function report on February 20, 2023.   Tr. 291-302.   He reported that he could not bend or squat and could only lift eight pounds.   Tr. 291.   He could not "stand any amount of time" or sit for "longer than five minutes."   Tr. 291.   He could not walk "any distance without my back brace and cane."   Tr. 291.   Every morning, he fed and watered chickens and horses.   Tr. 292.

### 3.   Evidentiary Hearing

The ALJ conducted an evidentiary hearing on May 9, 2024.   Plaintiff testified that prior to December 20, 2020, he worked as a welder.   Tr. 47-51.   Since then, the pain in his neck has "gotten much worse" and he has had to receive regular epidural steroid injections for that pain. Tr. 51.

At the time of the hearing, Plaintiff drove his truck daily to run errands for his mother and a motorcycle that he would ride 4-6 times a year.   Tr. 44, 53.   He owned a 20-acre horse farm and also cared for multiple dogs.   Tr. 46.   The horses and dogs were therapeutic for him, as he suffered from PTSD related to military service. Tr. 55.   While performing chores, the heaviest item that he lifted was a bag weighing 45-50 pounds.   Tr. 46.   He moved the bags from the tailgate of his truck to a tractor.   Tr. 52.   Then he would drive the tractor to the feed barrels, slice the bag(s) open, and use the bucket on the tractor to drop the feed into barrels for the horses.   Tr. 52.   Plaintiff's attorney asked "why not sell your farm" and Plaintiff responded "I'm not built for town…we love the quiet and the safety and peace and quiet of our place."   Tr. 55.   Despite his injuries, he was able to take care of his property and animals because "I can do whatever limit [I

need] and "if I need a break, I can stop."   Tr. 58.

The ALJ asked Plaintiff to explain what prevented him from working.   Tr. 51.   Plaintiff testified "my neck and my shoulder" and "my leg and my back."   Tr. 51.   He could walk "100 yards on a good day" before resting and stand for 10 minutes or less.   Tr. 51.   He could sit in a "padded chair…not a hard wood chair, not a recliner" for 30-40 minutes at a time.

The ALJ posed the following hypothetical to the vocational expert:

> An individual of the same age, education, work history as [Plaintiff]. Further assume this individual could perform lightwork as defined in the regulations.   However, this individual could perform frequent handling and overhead reaching with the left upper extremity, can never climb ladders, ropes, or scaffolding, but can frequently climb ramps and stairs.   The claimant or the individual can occasionally balance, stoop, kneel, crouch, and crawl. The individual can never drive commercial vehicles.   The individual would need to avoid vibrations—avoid concentrated exposure to vibrations and hazards as defined in the Selected Characteristics of Occupations and the Dictionary of Occupational Titles.

Tr. 60.

The vocational expert testified that the hypothetical individual could not perform his past work, but there was other work existing in the national economy that he could perform.   Tr. 60-61.   In response to questioning by Plaintiff's counsel, the expert testified that if the hypothetical individual could stand and/or walk for no more than 10 minutes at a time, there would be no light work available. Tr. 63.

Plaintiff testified that he "sometimes" used a cane.   Tr. 61.   He explained that at a graduation ceremony, he kept the cane with him and used it to climb stairs.   Tr. 62.   The vocational expert testified that if the hypothetical individual needed to occasionally use a cane to ambulate (meaning "very little up to one third of the day"), he could not perform light work, but

there would be sedentary work.   Tr. 62.   However, Plaintiff did not have transferable skills for sedentary work.   Tr. 62.

### Analysis

Plaintiff reported that pain impairs his ability to perform work-related activities.   The ALJ was therefore required to consider Plaintiff's reported pain and determine whether there was "objective medical evidence from an acceptable medical source that shows [Plaintiff has] medical impairments which could reasonably be expected to produce the pain…alleged and that, when considered with all of the other evidence…would lead to a conclusion that [Plaintiff is] disabled." 20 C.F.R. §404.1529(a).   There must be a "logical bridge" between the medical evidence and the RFC.   *Minnick*, 775 F.3d at 937.

Here, the ALJ did not find that Plaintiff was credible when he testified regarding his pain and symptoms.   The ALJ concluded that the RFC permitting Plaintiff to perform light work "is supported by the lack of evidence regarding the claimant's subjective allegations, his mostly mild examination findings, and his ability to perform daily activities."   This conclusion is problematic because the ALJ failed to identify "mostly mild examination findings."   In fact, the ALJ only cited to one record that contained "mild" findings: a December 2022 cervical spine x-ray that showed "**mild** disc space narrowing at C3-C4.   Post op changes at C4-C5 and C5-C6…. **mild** spondylosis of the upper cervical spine."   That same report also mentioned "**moderate** spondylosis from C4-C6" and "**moderate severe** narrowing bilaterally C4-5, C5-6, and C6-7." Tr. 26, 671.

Though he cited the visits immediately preceding and after an exam by his physician in March 16, 2021 (Tr. 25), the ALJ omitted the following note:

> I had a chance to see William today in follow-up and to review his imaging
> studies of the cervical spine.   William does have multilevel degenerative

Page **9** of **11**

> disc disease and has had a cervical epidural done….He does have congenital fusion at C2/3 which is likely due to a previous injury as he had some fairly severe neck injuries in the military when jumping out of plan. It is hard to say for sure whether any cervical surgery will do him any good as he does have an artificial disc at C4/5 and C6/7.   I would like to see how he does with some nerve burning since he clearly has **severe facet arthropathy** at multiple levels.   If he does need some surgical intervention [w]e will likely have to send him to the city as the types of artificial discs that he has placed can be very difficult to remove.

Tr. 406 (emphasis added).   The ALJ further omitted a report from x-rays of Plaintiff's lumbosacral spine in June 2022 that stated he had severe degenerative joint disease and severe spondylosis.   Tr. 475.   On the same day those x-rays were performed, Plaintiff's physician noted positive findings in a lumbar exam and that Plaintiff had radicular symptoms that reproduced pain. Tr. 475.

Of course, the ALJ is not required to evaluate every piece of evidence.   *Reinaas v. Saul*, 953 F.3d 461, 467 (7th Cir. 2020).   This case must be remanded, however, because the ALJ discounted Plaintiff's subjective reports of pain by reasoning that the records showed "mostly mild examination findings", only cited to two mild examination findings (both found in one x-ray report), and omitted any reference or discussion of records that showed moderate to severe conditions.   *Id*.   Overall, the ALJ failed to build a logical bridge from the evidence to his conclusion.

The ALJ heavily focused on the multiple instances in the records where Plaintiff reported activities that, the ALJ believed, supported a finding that Plaintiff could perform light work: being crushed by a horse, being hit by a trailer ramp, sliding down a tree on a deer stand, lifting a heavy object, carrying a fence post, "some" welding.   The ALJ also mentioned Plaintiff's testimony that he takes as many breaks as needed to complete chores on his horse farm, but provided no

analysis as to why Plaintiff's ability "to do limited work to maintain his small farm" means that

"he would be able to work full time." *Id*.   The ALJ's failure to analyze Plaintiff's testimony

regarding taking as many breaks as needed (and for as long as needed) to perform chores on his

farm, as well as the failure to consider the medical records reflecting moderate to severe conditions,

requires remand. *Id*.

Plaintiff argues in passing that the hypothetical posed to the vocational expert was

impermissibly vague, but fails to cite case law in support of this argument.   Because the argument

is underdeveloped, the Court declines to consider it. *Puffer v. Allstate Ins. Co*., 675 F.3d 709, 718

(7th Cir. 2012).

### Conclusion

After careful review of the record as a whole, the Commissioner's final decision denying

Plaintiff's application for a period of disability and disability insurance benefits is REVERSED

and REMANDED to the Commissioner for further proceedings consistent with this Order.

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED: March 18, 2026**

s/ *Reona J. Daly*

**Hon. Reona J. Daly**
**United States Magistrate Judge**